2026 IL App (4th) 251327

NO. 4-25-1327

FILED
July 8, 2026
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* JACOB P., a Person Found Subject to Involuntary Admission and Administration of Psychotropic Medication | ) ) ) ) | Appeal from the Circuit Court of Adams County No. 25MH265 |
| (The People of the State of Illinois, Petitioner-Appellee, v. Jacob P., Respondent-Appellant). | ) ) ) ) ) ) | Honorable John C. Wooleyhan, Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Vancil and Grischow concurred in the judgment and opinion.

**OPINION**

¶ 1 Respondent, Jacob P., was the subject of a petition for involuntary admission to a mental health facility and a petition for administration of psychotropic medication. Following a hearing, the trial court granted the petitions and ordered respondent to be involuntarily admitted for mental health treatment for up to 90 days and to be administered psychotropic medication. Respondent appeals, arguing we should reverse the orders because (1) the predisposition report did not comply with the requirements of section 3-810 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/3-810 (West 2024)), (2) the court improperly combined the hearings on the petitions for admission and administration of medication, in violation of section 2-107.1 of the Code (405 ILCS 5/2-107.1 (West 2024)), (3) respondent did not receive adequate notice of the petition for administration of psychotropic medication under section 2-107.1 (405

ILCS 5/2-107.1 (West 2024)), (4) respondent was not given sufficient written information regarding the proposed treatment, as required by section 2-102(a-5) (405 ILCS 5/2-102(a-5) (West 2024)), and (5) respondent received ineffective assistance of counsel. For the reasons that follow, we affirm the trial court's order granting the petition for involuntary admission but reverse the order granting the petition for administration of psychotropic medication.

¶ 2                                    I. BACKGROUND

¶ 3            On November 26, 2025, Deputy Kelsey Tuley of the Adams County Sheriff's Office completed a petition for involuntary admission as to respondent, who had been admitted on an emergency inpatient basis to Blessing Hospital. The petition indicated that respondent was a person with a mental illness who (1) because of his illness, was reasonably expected to engage in conduct placing himself or another in physical harm, (2) because of his illness, was unable to provide for his basic physical needs to prevent serious harm, (3) refused treatment or did not adhere to prescribed treatment and, because of the nature of his illness, was unable to understand his need for treatment, and (4) was in need of immediate hospitalization for the prevention of such harm.

¶ 4            Tuley explained in the petition that he was dispatched to check respondent's well-being after respondent texted and called 911 "saying that his father was trying to kill him by [poisoning] him or working with others to try and have [him] killed" and that he "had been stabbed multiple times 'with something in his body.' " Tuley located respondent and his parents at their residence, and respondent told him that "he's been living with friends in the St. Louis area but that he's been struggling with [anxiety] and fear knowing that people have been trying to follow and possibly kill him since he was 16 years old." Tuley reported that respondent's story "was a bit hard to follow," but respondent stated that "the government has been trying to track, follow and possibly kill him" and he "believes they've placed explosives inside his body." He believed his parents

were involved. He also reported "spitting up 'bungee' material" that had been "placed inside his body by the government or royalty." He also told Tuley that "he has seen a large man with a knife hiding waiting to come after him in the past." He denied telling a doctor about these experiences in the past or being diagnosed with a mental illness. He initially did not want to go to the hospital in an ambulance but eventually agreed to go and be evaluated.

¶ 5        Dr. Michael Kim, a physician at Blessing Hospital, indicated in the petition's inpatient certificate that he personally examined respondent, who was

> "acting erratically, asked parents to pick him up from St. Louis and then he contacted 911 saying he's being kidnapped. 3 weeks ago slashed family's car tires and told parents they're going to die. Also has paranoid thoughts of being hurt. Also thinks there is a bomb inside him and that he's been throwing up bungee cords."

¶ 6        On December 1, 2025, Dr. Salvador Sanchez at Blessing Hospital completed a petition for administration of psychotropic medication, stating that respondent required psychotropic medication because he was "[p]aranoid that somebody is trying to kill him," "[s]tabbed tires," and lacked capacity to give informed consent to the psychotropic medication. He sought to administer the psychotropic medication Invega, 3 milligrams daily, to respondent for 90 days, with alternative treatments of "Invega sustenna" in either a 156 or 234 milligram dosage.

¶ 7        Both petitions were filed in the trial court on December 1, 2025. On December 2, 2025, the court issued an order setting a hearing for December 8, 2025, and appointing the public defender as counsel for respondent. A stamp on the order indicated that a copy of the order was personally delivered to the state's attorney's office and counsel ("KD," presumably Kent Dean, respondent's public defender).

¶ 8        The trial court held a hearing on the petitions on December 8, 2025. Respondent

- 3 -

was not present; his counsel indicated that he spoke with respondent "last week in preparation for this hearing" and respondent indicated he would "likely be attending," but he informed his counsel "this morning he's declining to attend." Counsel moved to waive his presence, and the court granted the motion. The court indicated that it "would first be taking up the petition for involuntary admission."

¶ 9 The State first called Dr. Sanchez, a psychiatrist at Blessing Hospital. The parties stipulated that he was an expert in the field of psychiatry. Dr. Sanchez testified that respondent was brought to Blessing Hospital's emergency department on November 26, 2025, "by law enforcement as petitioned by [respondent's] parents." Dr. Sanchez had contact with respondent daily while he was on call. He testified that a mental status exam indicated that respondent had paranoid schizophrenia, which manifested as "paranoid delusions with a fear of persecution and also what we call somatic delusions, such as believing that somebody implanted an explosive device in his body and that he has been throwing up Bungee cords." There were, in fact, no implants or bungee cords present in respondent's body. Dr. Sanchez explained that respondent was "extremely guarded, very suspicious and very paranoid." According to respondent's parents and law enforcement, respondent had been suffering from paranoid delusions since he was 16 years old and, in the past six months, became paranoid that "there are people who are conspiring to kill him, to have him murdered, [and] that he slashed the tires of *** the family vehicles at home." Dr. Sanchez testified that respondent "refuses to talk to [him] or to provide any information at length" and "has not allowed [him] to contact anybody outside of the hospital for collateral information."

¶ 10 Dr. Sanchez further testified that he had been "offering [respondent] medication daily since the day he was admitted and he has refused to take it until this morning he took one dose of the medication because he believes that that will allow him to be discharged from the

hospital sooner." That medication was Invega. Dr. Sanchez stated that he believed respondent would not be able to care for himself due to his illness because he was missing for three months and "displayed unpredictable and potentially dangerous behaviors such as stabbing the tires of the cars."

¶ 11　　　　Dr. Sanchez recommended that respondent "be Court ordered to [Blessing Hospital] for up to 90 days with a leave to transfer to a facility of the Department of Human Services for the remainder of his commitment should he fail to improve." Dr. Sanchez believed Blessing Hospital was the least restrictive setting for respondent and that outpatient treatment would not be acceptable because respondent was noncompliant with treatment and medications and had not allowed anyone "to contact the family to view the support system or support network or to establish outpatient followup." At the State's request and without objection, the trial court admitted People's exhibit No. 1, which was a copy of respondent's medical records between November 27 and December 1, 2025, and People's exhibit No. 2, which was a predisposition report prepared by members of respondent's treatment team. The court specifically asked respondent's counsel with respect to each exhibit whether he objected to its admission, and counsel indicated he did not.

¶ 12　　　　On cross-examination, Dr. Sanchez testified that several of respondent's behaviors were reported to him secondhand and that respondent did not personally say anything to corroborate damaging a family member's tires. Dr. Sanchez stated that his diagnosis of respondent was based on his observations and reports from family, as he did not have any prior records pertaining to respondent's mental health. Dr. Sanchez confirmed that respondent did not have to be restrained; had not behaved in a threatening manner toward anyone; and had no issues feeding himself, toileting, or performing other personal care tasks.

¶ 13    On redirect examination, Dr. Sanchez testified that respondent recognized that he was in the hospital but indicated repeatedly that "he's unwilling to receive treatment for a condition that he does not have" and was "not willing to recognize the fact that he does suffer from a medical condition, namely paranoid schizophrenia."

¶ 14    At this point, the trial court had the following exchange with the parties:

"THE COURT: Anything else on that, Mr. Dean [(respondent's counsel)]?

MR. DEAN: Nothing to add.

THE COURT: Any other evidence on this petition, Mr. Jansen [(assistant state's attorney)]?

MR. JANSEN: No, Your Honor.

THE COURT: Or Mr. Dean?

MR. DEAN: Just argument.

THE COURT: If we go ahead and receive evidence on the other petition then have argument on both, is there any problem with that, Mr. Jansen?

MR. JANSEN: No problem with that procedure, Your Honor.

THE COURT: Or Mr. Dean?

MR. DEAN: Not at all.

THE COURT: So at this point we would be looking at the petition for administration of psychotropic medications that had also been filed and we'd be receiving any evidence you had on that ***."

¶ 15    The State called Dr. Sanchez again. The trial court noted that Dr. Sanchez "has already been sworn for a previous hearing today and has already been qualified as an expert in the field of psychiatry, showing those things on the record for this petition." Dr. Sanchez testified that

his "recommendation would be for [respondent] to receive administration of medication that has been FDA approved for the treatment of his diagnosis, his condition, which is paranoid schizophrenia. The medication being Invega." The medication is usually "three doses by mouth, three milligrams each daily for three days followed by administration of a long-acting injectable of the same medication administered within a week," with the "[f]irst dose 234 milligrams followed by the second dose of 156 milligrams," then followed by the "maintenance dose" of "156 milligrams every four weeks." Dr. Sanchez explained this was the standard dosing and that the side effects of an injectable are "localized pain" and "[v]ery rarely an abscess of infection under the skin or muscle" and, "[l]ike any medication, he could have allergic reaction," which is why they offer the medication by mouth before proceeding to the injections. Other side effects included "weight gain, increase of blood pressure, diabetes, [and] abnormal involuntary movements," for which they would monitor respondent on a regular basis. Monitoring those side effects would involve thyroid testing, urine testing, and an electrocardiogram, which he was requesting the court to authorize. He believed the benefits of this treatment would outweigh any potential harmful side effects.

¶ 16     Dr. Sanchez stated that he had attempted to speak to respondent about this medication every morning and respondent "refuse[d] to take [it] with the exception of this morning," as he "believes that if he takes the medication willingly, he should be able to go home sometime this week." Respondent had not yet experienced any benefits or adverse reactions to the dose of medication he took that morning. Dr. Sanchez again stated that respondent does not believe he has a mental illness. Dr. Sanchez testified that respondent "lacks the capacity to understand the circumstances following his mental illness" and thus "lacks the capacity needed to make a rational decision about the treatment," although he "does have the capacity to benefit and to respond to the

*** proposed treatment." Dr. Sanchez believed that, if respondent "were to go home without receiving proper treatment, he will continue to deteriorate." Dr. Sanchez could not identify an advanced directive or power of attorney on respondent's behalf, so there was no third party to make these decisions for him, and respondent was "not making good decisions."

¶ 17 On cross-examination, Dr. Sanchez testified that respondent had been offered the medication both orally and via injection and declined both. He said he had a conversation with respondent that morning about why he was willing to take the medication and that respondent indicated that "he had a conversation with [respondent's counsel] over the weekend and that you guys had a conversation about him possibly being a subject of involuntary treatment."

¶ 18 The trial court indicated it had some further questions for Dr. Sanchez. Dr. Sanchez testified that respondent "has been informed of the benefits and risk of receiving or not receiving the treatment" by both Dr. Sanchez and the nursing staff. This information was offered to respondent both verbally and with "a pamphlet with extensive information on the medication, including indications, risks, benefits, and side effects."

¶ 19 The trial court then proceeded to arguments on both petitions. The State first addressed the petition for involuntary admission, arguing that respondent had been diagnosed with paranoid schizophrenia, and without treatment, he would deteriorate in his ability to function and could harm himself or others. The State then addressed the petition for administration of psychotropic medication, arguing that the benefits of the treatment would outweigh any risks and emphasizing that respondent received information both verbally and in writing about the side effects and benefits but until that morning was unwilling to engage in that treatment. The State reiterated Dr. Sanchez's testimony that respondent "lacks the capacity to make a reasonable decision about his treatment and other least restrictive services such as outpatient have been

considered and are found to be inappropriate due to the patient's noncompliance with his treatment."

¶ 20    In turn, respondent's counsel argued that respondent's diagnosis and projection of future harm was "based on secondhand reports from family, which are not corroborated by anything that has taken place here or anything that [respondent] is doing." Counsel emphasized that it was "pure speculation" to say respondent was unable to take care of himself. Counsel then contended that "the predisposition report before us is a general summary discussion of *** what is known about this young man at this time," but it contained "nothing about what would be triggering events to get this young man either to—whether he needs to be transferred to another facility or what it would take for him to be deemed sufficiently stable to be released." He argued that "[t]he predisposition report should contain at least something about what we need to see from this person in order to demonstrate some sort of progress" but that he "do[es not] see anything about that in here other than nothing more than 90 days," which is "all the statute allows for" but was "not a plan." Then, addressing the petition for psychotropic medication, counsel indicated he "would just echo the same arguments I made before," as they "apply to both" petitions. Counsel pointed out that the fact that respondent was willing to take medication that morning was "showing ability to strategize" and "an ability to plan." He contended that the State did not meet its burden on either petition.

¶ 21    The trial court found that the State proved the petition for involuntary admission by clear and convincing evidence. The court emphasized that the evidence showed "that the respondent does currently suffer from a mental illness and because of that illness, the respondent is currently unable to provide for his own needs so as to guard himself from any harm without the assistance of others." The court noted that respondent had been refusing treatment and, "because

of the nature of his illness, is unable to understand the need for treatment and if he does not receive inpatient treatment, he would be continuing to suffer deterioration," and thus, immediate hospitalization was necessary to prevent those harms. The court found that the predisposition report satisfied the requirements of section 3-810 of the Code (405 ILCS 5/3-810 (West 2024)). The court further found that the least restrictive setting for respondent would be Blessing Hospital for a period of time not exceeding 90 days, with leave to transfer to the Illinois Department of Human Services.

¶ 22 The trial court then found that the State proved by clear and convincing evidence all the statutory factors for the petition for administration of psychotropic medication, and the order would be in effect for up to 90 days. The court found that respondent "was advised both orally and in writing of the side effects, risks, and benefits and alternative treatments with regard to the administration of these medications," in compliance with section 2-102 of the Code (405 ILCS 5/2-102 (West 2024)).

¶ 23 This appeal followed.

¶ 24       II. ANALYSIS

¶ 25 On appeal, respondent argues (1) the predisposition report did not comply with section 3-810 of the Code (405 ILCS 5/3-810 (West 2024)); (2) he did not receive adequate notice of the petition for administration of psychotropic medication under section 2-107.1 (405 ILCS 5/2-107.1 (West 2024)); (3) the trial court failed to comply with section 2-107.1 (405 ILCS 5/2-107.1 (West 2024)) by combining the hearings on the petitions for admission and administration of medication; (4) he was not given the written information regarding the proposed treatment, as required under sections 2-107.1 and 2-102 (405 ILCS 5/2-107.1, 2-102 (West 2024)); and (5) he received ineffective assistance of counsel where counsel failed to adequately object to the

noncompliant predisposition report, move to dismiss the petition for involuntary treatment for being facially deficient, and object to the State's failure to introduce evidence that respondent received written information regarding the proposed treatment.

¶ 26                                  A. Mootness

¶ 27        Respondent concedes that the order for involuntary admission expired on March 8, 2026, and is therefore moot. See *In re Anne W.*, 2025 IL App (4th) 241257, ¶ 15 (stating an order for involuntary admission is moot where it has expired).

¶ 28        "As a general rule, courts in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided." *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009). However, there are exceptions to this rule. Respondent contends that we may review this appeal under the exceptions to mootness applicable to issues capable of repetition yet evading review or issues affecting the public interest. The State disagrees that either of these exceptions applies and argues the issues that respondent raises are not broad statutory interpretation issues likely to recur but instead are fact-specific challenges.

¶ 29        To fall within the capable of repetition yet avoiding review exception, (1) "the challenged action must be of a duration too short to be fully litigated prior to its cessation" and (2) "there must be a reasonable expectation that the same complaining party would be subjected to the same action again." (Internal quotation marks omitted.) *Alfred H.H.*, 233 Ill. 2d at 358.

¶ 30        In addition, this exception generally applies only when a party "raise[s] a constitutional argument or challenge[s] the interpretation of the statute," as a challenge to the sufficiency of the evidence would not "be of use to respondent in future litigation." *Alfred .H.*, 233 Ill. 2d at 360. To fall under this exception, "this case and any potential future action 'must

have a substantial enough relation that the resolution of the issue in the present case would be likely to affect a future case involving respondent.' " *Anne W.*, 2025 IL App (4th) 241257, ¶ 18 (quoting *Alfred H.H.*, 233 Ill. 2d at 359). Thus, even if the first two requirements are met, any issues that are clearly specific to the instant case do not meet the requirements for the capable of repetition yet evading review exception. See *Anne W.*, 2025 IL App (4th) 241257, ¶ 19; *Alfred H.H.*, 233 Ill. 2d at 358, 360; *In re Sharon H.*, 2016 IL App (3d) 140980, ¶¶ 24, 28. Where a respondent asserts a pure challenge to the sufficiency of the evidence, the argument does not fall under an exception to mootness. See *Alfred H.H.*, 233 Ill. 2d at 350; *Sharon H.*, 2016 IL App (3d) 140980, ¶ 18; *Anne W.*, 2025 IL App (4th) 241257, ¶ 14. However, claims that the State and trial court failed to comply with statutory provisions and that the respondent's counsel was ineffective have been found not to be questions merely involving the sufficiency of the evidence and were thus not moot. See *Sharon H.*, 2016 IL App (3d) 140980, ¶¶ 24-25, 28, 32-33; *Anne W.*, 2025 IL App (4th) 241257, ¶ 19; *In re Marcus S.*, 2022 IL App (3d) 160710, ¶ 49.

¶ 31 Here, respondent does not directly challenge the sufficiency of the evidence. Rather, each of his challenges on appeal asserts that the trial court or State failed to comply with the statutory provisions or that his counsel was ineffective. As in *Sharon H.* and *Anne W.*, these issues concern the proper application of the Code and are not specific to this particular case. Both parties recognize that the short duration of involuntary admission and medication orders satisfy the first criterion. *Alfred H.H.*, 233 Ill. 2d at 358. The second criterion is satisfied because there is a reasonable expectation that respondent would be subjected to an involuntary admission action again. Although he has not been involuntarily admitted before, he has a 10-year history of mental illness that manifested in severe symptoms in fall 2025. See *Anne W.*, 2025 IL App (4th) 241257, ¶ 17. Respondent's arguments thus fall within the capable of repetition yet evading review

exception to mootness, and we need not address whether the public interest exception applies.

¶ 32                                B. Predisposition Report

¶ 33        Respondent argues that the trial court erred in granting the petition for involuntary admission where the predisposition report failed to comply with section 3-810 of the Code (405 ILCS 5/3-810 (West 2024)) because neither the report nor the testimony sufficiently addressed the goals of treatment or a timeline for achieving those goals, instead merely restating the request for commitment up to the statutory maximum of 90 days. Respondent contends that he appropriately objected to the predisposition report.

¶ 34        1. *Whether Strict or Substantial Compliance With Section 3-810 Is Necessary*

¶ 35        Section 3-810 of the Code provides:

> "Before disposition is determined, the facility director or such other person as the court may direct shall prepare a written report including information on the appropriateness and availability of alternative treatment settings, a social investigation of the respondent, a preliminary treatment plan, and any other information which the court may order. The treatment plan shall describe the respondent's problems and needs, the treatment goals, the proposed treatment methods, and a projected timetable for their attainment. If the respondent is found subject to involuntary admission on an inpatient or outpatient basis, the court shall consider the report in determining an appropriate disposition." 405 ILCS 5/3-810 (West 2024).

¶ 36        Generally, strict compliance with statutory procedures is required because the Code protects liberty interests. *In re Bonnie S.*, 2018 IL App (4th) 170227, ¶ 33. "However, failure to strictly comply with a provision of the Code does not require reversal when (1) a respondent fails

to object to alleged errors in the trial court and (2) [the] respondent was not prejudiced." *Bonnie S.*, 2018 IL App (4th) 170227, ¶ 33. We review *de novo* whether a respondent's statutory rights have been violated. *Bonnie S.*, 2018 IL App (4th) 170227, ¶ 33.

¶ 37    This court recently addressed the appropriate timing of an objection to a predisposition report in *In re Matthew J.*, 2026 IL App (4th) 250436-U, ¶¶ 38-44. In that case, the respondent objected to the State's failure to introduce a written predisposition report for the first time during closing arguments. *Matthew J.*, 2026 IL App (4th) 250436-U, ¶ 42. We explained:

" 'Where a respondent fails to object to the absence of a predispositional report, strict compliance with section 3-810 is required only when the legislative intent cannot otherwise be achieved.' [*In re Robinson*, 151 Ill. 2d 126, 134 (1992)]. In such situations, 'oral testimony containing the information required by the statute can be an adequate substitute for the presentation of a formal, written report prepared by the facility director or some other person authorized by the court.' *Robinson*, 151 Ill. 2d at 134. However, 'strict compliance is only excused where counsel for respondent fails to object.' *In re E.L.*, 316 Ill. App. 3d 598, 607 (2000). Where counsel objects to the absence of a written report, oral testimony cannot satisfy section 3-810 of the Code. *E.L.*, 316 Ill. App. 3d at 607; see *In re Scott A.*, 2025 IL App (4th) 250435-U, ¶¶ 16, 20 (finding strict compliance with section 3-810 was necessary because respondent's counsel objected to the lack of a predisposition report).

'The function of the objection is, first, to signify there is an issue of law, and secondly, to give notice of the terms of the issue.' *People v. Trefonas*, 9 Ill. 2d 92, 98 (1956). Failure to make a proper and timely objection constitutes a forfeiture

of the right to object. *Trefonas*, 9 Ill. 2d at 98; *People v. Bean*, 17 Ill. App. 3d 377, 382 (1974). To be timely, an objection must be made 'as soon as the grounds for the objection become apparent.' *Total Staffing Solutions, Inc. v. Staffing, Inc.*, 2023 IL App (1st) 220533, ¶ 47.

A timely objection is necessary to allow the non-objecting party a reasonable opportunity to correct the alleged deficiency. See *People v. Hopson*, 2012 IL App (2d) 110471, ¶ 18. Failure to timely object deprives a party of the opportunity to cure the alleged defect. *Hopson*, 2012 IL App (2d) 110471, ¶ 18. Thus, a party who fails to object until after the close of evidence forfeits the objection. See *Hopson*, 2012 IL App (2d) 110471, ¶ 18 (stating that defendant was ' "sandbagging" the State by failing to give it the opportunity to cure the alleged defect and attempting to succeed on a procedural technicality' where defense counsel did not object to a witness's testimony until 'arguments after the court closed the evidence'); see also *Schaffer v. Dorsey*, 70 Ill. App. 2d 390, 393-95 (1966) (holding that the defense counsel's objection to the testimony of a witness was untimely where it was made after the plaintiff rested his case).

Here, respondent's counsel did not object to the lack of a predisposition report during the State's case-in-chief but, rather, asserted for the first time in closing argument that 'there is no sufficient predisposition report.' Counsel's 'objection' was untimely because it was made after the close of evidence and denied the State the opportunity to cure the alleged deficiency. See *Hopson*, 2012 IL App (2d) 110471, ¶ 18; *Schaffer*, 70 Ill. App. 2d 390.

Because respondent did not timely object to the lack of a predisposition

report, strict compliance with the statute was not required. See *Robinson*, 151 Ill. 2d at 134. As such, oral testimony containing the information required by the statute could serve as an adequate substitute for the presentation of a formal, written report. See *Robinson*, 151 Ill. 2d at 134." *Matthew J.*, 2026 IL App (4th) 250436-U, ¶¶ 39-43.

¶ 38 The same is true here, where respondent did not raise any issue with the predisposition report until closing arguments. We reiterate our holding in *Matthew J.*: an objection to the statutory compliance of the predisposition report made during closing arguments is untimely and does not compel strict compliance with section 3-810. Respondent contends this holding is untenable, as it requires a respondent to "be vigilant to detect when the State is going to close its case," so that he can "interject an objection before their case closes to preserve the State's failure to comply with [section] 3-810." That a respondent must be vigilant during involuntary commitment proceedings to raise and preserve any errors should not be a novel concept—forfeiture rules generally require counsel to object at the appropriate time to preserve any errors for appeal. Moreover, this requirement does not require an attorney for a respondent to predict when the State will close its evidence. Here, for example, the State explicitly moved to admit the predisposition report into evidence. This was the time for respondent's counsel to raise any objections. However, when specifically given the opportunity to object by the trial court, respondent's counsel stated, "No, Judge." Because respondent did not object at that time or at any other time prior to closing arguments, he failed to timely object. As a result, only substantial compliance with section 3-810 was necessary, and oral testimony containing the required information would be sufficient.

¶ 39                    2. *Compliance With Section 3-810*

¶ 40        Respondent argues that, even if his objection was untimely, the State still failed to substantially comply with section 3-810 because neither the predisposition report nor the testimony sufficiently laid out specific treatment goals and a timeline applicable to respondent. Our review of this issue is *de novo*. *Sharon H.*, 2016 IL App (3d) 140980, ¶ 36.

¶ 41        Section 3-810 requires the predisposition report to contain information about a preliminary treatment plan, which "shall describe the respondent's problems and needs, the treatment goals, the proposed treatment methods, and a projected timetable for their attainment." 405 ILCS 5/3-810 (West 2024).

¶ 42        Here, the predisposition report outlined the following:

"Treatment Plan: [Respondent's] treatment plan focuses on counseling on mitigation of risks identified in relation to patient's threats to himself and others and working with patient and patient's family on developing appropriate safety plan as well as developing healthier ways to manage emotions and medication compliance in order to stabilize and learn skills to return home.

Description of the respondent's problems and needs: [respondent] continues to refuse medications as offered and continues to refuse any laboratory investigations and refuses to meet with his psychiatrist at length or to talk to this therapist. He is avoidant and dismissive when therapist attempts to engage with him. [Respondent] remains very guarded, suspicious, paranoid, and delusional.

Very bizarre in the unit, displaying psychotic symptoms and attending and responding to internal stimuli.

Treatment goals: [Respondent] will attend clinical groups daily on the unit.

[Respondent] will take medications as prescribed. [Respondent] will participate in individual therapy daily.

Treatment methods: Group therapy, individual therapy including CBT and motivational interviewing[.]

Timeline for achievement of the goals: No greater than 90 days."

¶ 43 The predisposition report sufficiently describes the treatment goals and methods. While the section labeled "[t]reatment methods" provides the more general goals of "Group therapy, individual therapy including CBT and motivational interviewing," the discussion of respondent's treatment plan clearly indicates that these methods were being used to specifically address the "mitigation of risks identified in relation to patient's threats to himself and others," "working with patient and patient's family on developing appropriate safety plan," and "developing healthier ways to manage emotions and medication compliance in order to stabilize and learn skills to return home." Additionally, the section titled "Treatment goals" clarified the frequency with which respondent should attend clinical groups and individual therapy, as well as adding the goal that respondent take medications as prescribed. Taken together, these three sections of the predisposition report sufficiently comply with the requirements of section 3-810 to describe respondent's treatment goals and proposed treatment methods.

¶ 44 The predisposition report likewise sufficiently justified the request for up to 90 days of commitment. In *Bonnie S.*, 2018 IL App (4th) 170227, ¶¶ 51-52, the treating psychiatrist testified that " '[the respondent] needs a higher level of care and a long-term treatment for her psychiatric problems' " where "outpatient treatment had failed," and "[the] respondent had been repeatedly hospitalized within the last few months to little effect because she was unable to comply with treatment." This court found that this testimony was sufficient to substantially comply with

the requirement of section 3-810 to provide a projected timeline and justify the request for the statutory maximum, as the testimony "allow[ed] the trial court to make an informed decision." *Bonnie S.*, 2018 IL App (4th) 170227, ¶ 52. Here, although the section titled "Timeline for achievement of the goals" stated only a request for "No greater than 90 days," the statutory maximum, the remainder of the predisposition report justified that request. The report clearly outlined the severity of respondent's diagnosis, his refusal to take any medication, and his refusal to communicate with his psychiatrist and therapist. These facts both made it difficult for respondent's care team to precisely outline a projected timeline for achieving his treatment goals, as the State points out on appeal, and separately justified the request for commitment for the statutory maximum. These facts allowed the trial court to make an informed decision about whether to grant the petition for the requested amount of time and were thus sufficient to satisfy the requirements of section 3-810 to provide a projected timetable for the achievement of respondent's treatment goals.

¶ 45       Moreover, because all the information necessary to comply with section 3-810 of the Code was contained in the predisposition report and we need not even look to the oral testimony, the predisposition report not only substantially complied with section 3-810 but strictly complied. As a result, even if respondent's counsel had objected at the appropriate time when the State offered the report into evidence, the outcome of the proceeding would not have been different and counsel was not ineffective. See *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (To demonstrate ineffective assistance of counsel, defendant must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.")

¶ 46                        C. Hearings on Separate Petitions

¶ 47        Respondent argues that the trial court failed to conduct separate hearings on the admission and treatment petitions, as required by statute. However, as respondent invited this error by affirmatively acquiescing to the trial court's proposed procedure, he is precluded from challenging it on appeal.

¶ 48        Section 2-107.1(a-5)(2) of the Code provides that the trial court must hold a hearing within seven days of the filing of a petition for the administration of psychotropic medication, which "shall be separate from a judicial proceeding held to determine whether a person is subject to involuntary admission but may be heard immediately preceding or following such a judicial proceeding and may be heard by the same trier of fact or law as in that judicial proceeding." 405 ILCS 5/2-107.1(a-5)(2) (West 2024).

¶ 49        Where testimony on the two petitions is intermingled, the procedure clearly violates section 2-107.1. See *In re Alaka W.*, 379 Ill. App. 3d 251, 274-76 (2008); *In re Daniel A.*, 2023 IL App (2d) 210029, ¶ 23. However, even where the testimony is not intermingled, but argument and ruling are, the hearings are not sufficiently separate. In the unpublished decision in *In re Christian K.*, 2026 IL App (4th) 250560-U, ¶¶ 53-55, this court addressed a very similar case. There, as here, the physician testified twice on separate petitions, but the court "heard his testimony on both petitions before hearing arguments on both petitions simultaneously" and "ruled on both petitions only after hearing the evidence and arguments related to both petitions." *Christian K.*, 2026 IL App (4th) 250560-U, ¶ 54. This court specifically noted that the respondent left the room during testimony concerning the petition for involuntary admission, which was important because, "[i]f there had been a separate hearing on the petition for involuntary medication, we would expect some acknowledgement from the court that respondent was not present for that hearing."

*Christian K.*, 2026 IL App (4th) 250560-U, ¶ 54. This court thus held that this procedure constituted a single hearing on both petitions and violated section 2-107.1. *Christian K.*, 2026 IL App (4th) 250560-U, ¶ 55.

¶ 50     The State contends that respondent invited any error, as the trial court asked the parties whether they had any problem with "receiv[ing] evidence on the other petition and then hav[ing] arguments on both," and respondent's counsel responded, "Not at all." In response, respondent argues that his counsel did not invite the error; instead, he declined to object or, alternatively, that his affirmative agreement is not the same as requesting to proceed in a certain manner.

¶ 51     Under the invited error doctrine, "a party cannot acquiesce to the manner in which the trial court proceeds and later claim on appeal that the trial court's actions constituted error." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 60. This doctrine extends to "[a]ffirmative representations that a party has no objection to the proceedings," as "such representations reassure the trial court and encourage it to proceed without further consideration of the issues." (Internal quotation marks omitted.) *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 54; see *People v. Cox*, 2017 IL App (1st) 151536, ¶ 76 ("When the defense invited the trial court to admit the certificate by affirmatively responding to the trial court's questions that it had no objection to its admission, we cannot find any error by the trial court."); *People v. Quezada*, 2024 IL 128805, ¶ 59 (holding that "trial counsel affirmatively acquiesced to the admission of" certain evidence when, "[i]n response to the prosecution's offer putting the statements into evidence, defense counsel stated, 'No objection, Judge' "); *People v. Caffey*, 205 Ill. 2d 52, 113-14 (2001) (holding that when the defendant was asked whether he objected to the introduction of a 911 recording and replied, " 'No objection, Judge,' " the defendant "acquiesced in the admission of this evidence").

¶ 52    Here, the State is correct that respondent's counsel affirmatively acquiesced to the trial court's suggested procedure to hear testimony first on the involuntary admission petition, then separately hear testimony on the medication petition, then hear arguments on both petitions. This affirmative acquiescence constitutes invited error. See *Aquisto*, 2022 IL App (4th) 200081, ¶ 54. Respondent does not dispute the State's premise that inviting the trial court to entertain arguments on both of the State's petitions simultaneously would preclude respondent from arguing on appeal that the judgment should be reversed based on the failure to hold separate hearings. Respondent in essence argues only that he did not invite the error, and the record refutes that argument. Because counsel invited any error, respondent may not challenge the procedure on the combined hearings and does not argue on appeal that his counsel was ineffective on this basis. See *People v. Brown*, 2023 IL App (4th) 220400, ¶ 31 (where a party has invited an error, it may challenge the error on appeal only by asserting ineffective assistance of counsel). There is thus no basis for this court to reverse the trial court's order granting the petition for involuntary admission.

¶ 53    With that said, we note that, in a situation that did not involve invited error, this court recently held that this same trial court violated section 2-107.1 of the Code where it employed a substantially similar procedure as it did here. See *Christian K.*, 2026 IL App (4th) 250560-U, ¶¶ 53-55. In fairness, respondent filed his notice of appeal in this case before we decided *Christian K.* We trust that courts will be sure in future cases to keep the proceedings on involuntary commitment petitions completely separate from the proceedings on medication petitions.

¶ 54    D. Notice of the Petition for Administration of Psychotropic Medication

¶ 55    Respondent also contends that he did not receive the statutorily required notice of the petition for involuntary administration of medication.

¶ 56    Under section 2-107.1(a-5)(1) of the Code:

"The petitioner shall deliver a copy of the petition, and notice of the time and place of the hearing, to the respondent, his or her attorney, any known agent or attorney-in-fact, if any, and the guardian, if any, no later than 3 days prior to the date of the hearing. Service of the petition and notice of the time and place of the hearing may be made by transmitting them via facsimile machine to the respondent or other party. Upon receipt of the petition and notice, the party served, or the person delivering the petition and notice to the party served, shall acknowledge service. If the party sending the petition and notice does not receive acknowledgement of service within 24 hours, service must be made by personal service." 405 ILCS 5/2-107.1(a-5)(1) (West 2024).

However, "strict compliance with the notice requirements in authorized-involuntary-treatment proceedings has been deemed unnecessary where the respondent had actual notice of the proceedings and ample opportunity to prepare a defense." *In re B.K.*, 362 Ill. App. 3d 324, 328 (2005).

¶ 57 Here, the trial court entered an order on Tuesday, December 2, 2025, setting the petitions for involuntary admission and administration of medication for a hearing on Monday, December 8, 2025. A stamp on the document indicated that a copy of this order was personally delivered to the state's attorney and counsel, "K.D.," who had been appointed as respondent's public defender in the same order. Respondent did not appear at the hearing on the petitions, but his counsel indicated that he "spoke with [respondent] last week in preparation for today's hearing," and while respondent initially "indicated to [counsel] that he would likely be attending today," counsel stated he was "informed this morning [respondent was] declining to attend."

- 23 -

Additionally, Dr. Sanchez testified that respondent told him that he "had a conversation with [his attorney] over the weekend *** about him possibly being a subject of involuntary treatment."

¶ 58        While there is no indication in the record that respondent acknowledged receipt of the petition or was personally served, there is evidence that his counsel was personally served with notice of the hearing on December 2, 2025—six days before the hearing. Respondent's counsel appeared at the hearing and did not object to any lack of formal notice. While respondent did not appear at the hearing, the record indicates that he knew of the hearing but chose that morning not to attend. Moreover, there is evidence in the record that respondent and counsel communicated during both the week and weekend before the hearing, implying that respondent had more than three days of actual notice of the hearing. Respondent does not explain on appeal how any lack of notice prejudiced him or prevented him from preparing a defense, and the record supports the conclusion that his counsel was prepared for the hearing, as he sufficiently cross-examined Dr. Sanchez and presented a cogent argument against the petitions. There is thus no basis to conclude that respondent lacked actual notice or an ample opportunity to present a defense.

¶ 59        E. Written Information About Proposed Treatment

¶ 60        Respondent argues that the trial court erred in granting the State's petition for involuntary admission where the State did not provide evidence that he was given written information regarding the side effects, benefits, and risks of the treatment, as well as alternatives to the proposed treatment, as required by statute.

¶ 61        "The State may secure an order providing for the administration of psychotropic medications to a respondent only if it proves the respondent lacks the capacity to make a reasoned decision to accept or refuse psychotropic medication." *Bonnie S.*, 2018 IL App (4th) 170227, ¶ 56 (citing 405 ILCS 5/2-107.1(a-5)(4)(E) (West 2018)). "Whether a respondent lacks such a capacity

can be determined only if the respondent has been provided with the information necessary to make a reasoned decision." *Bonnie S.*, 2018 IL App (4th) 170227, ¶ 56. To that end, section 2-102 requires that, if services include the administration of psychotropic medication, "the physician *** shall advise the recipient, in writing, of the side effects, risks, and benefits of the treatment, as well as alternatives to the proposed treatment, to the extent such advice is consistent with the recipient's ability to understand the information communicated." 405 ILCS 5/2-102(a-5) (West 2024). "We review *de novo* whether the State has complied with this requirement." *Bonnie S.*, 2018 IL App (4th) 170227, ¶ 56. Importantly, " 'the right to written notification is not subject to a harmless-error analysis,' and *** strict compliance with the procedural safeguards of the Code is necessary to protect the liberty interests involved." *In re A.W.*, 381 Ill. App. 3d 950, 957 (2008) (quoting *In re Louis S.*, 361 Ill. App. 3d 774, 780 (2005)).

¶ 62          Here, Dr. Sanchez testified that he and his nursing staff informed respondent about the side effects, risks, and benefits of the medication verbally and offered respondent "a pamphlet with extensive information on the medication, including indications, risks, benefits, and side effects." This sufficiently shows that respondent received written notice of the risks, benefits, and side effects of the treatment, as required by section 2-102. Respondent concedes that "there is no requirement that the written information provided to the Respondent be introduced as an exhibit" but asserts that, "in the absence of that information, there would have to be detailed testimony as to the contents of the written disclosure." However, respondent has provided no support, and we have found none, for his contention that more specific testimony about the contents of this written notification was required. See, *e.g.*, *In re Debra B.*, 2016 IL App (5th) 130573, ¶ 28 (holding the physician's testimony that he gave the respondent written information about the proposed medication and alternative medications was sufficient to allow the trial court to conclude that the

respondent had been provided with that information).

¶ 63　　　　　However, there was no testimony at the hearing on the petition for administration of psychotropic medication that respondent was offered written information about alternatives to the proposed treatment. In the petition, the "first choice" medication to be administered was listed as "Invega 3 mg daily," and "Alternatives" were listed as "Invega sustenna, 234 mg," and "Invega sustenna, 156 mg." However, at the hearing, Dr. Sanchez testified that the standard dosing and procedure for the administration of the desired medication was

> "three doses by mouth, three milligrams each daily for three days followed by administration of a long-acting injectable of the same medication administered within a week. First dose 234 milligrams followed by the second dose of 156 milligrams. Typically the dose—maintenance dose—will be repeated at 156 milligrams every four weeks."

This testimony makes it clear that the alternatives listed in the petition are not alternatives at all but merely a continuation of the series of medication. Where there is no evidence that a respondent was advised in writing about alternative treatments, the order for the involuntary administration of medication must be reversed. See *A.W.*, 381 Ill. App. 3d at 957 (reversing an order for involuntary administration of medication where there was testimony that the respondent was offered written notification of the side effects of the proposed treatment but not alternatives to the proposed treatment); *In re Laura H.*, 404 Ill. App. 3d 286, 292 (2010) (same); *In re Nicholas L.*, 407 Ill. App. 3d 1061, 1072 (2011) (same). Because the State did not present any evidence that respondent was notified in writing of treatment alternatives, either alternative medications or alternative nonmedicinal treatments, if reasonable, there was not strict compliance with the requirements of section 2-102(a-5), and the order for administration of medication must be reversed.

¶ 64                              F. Ineffective Assistance of Counsel

¶ 65        Because we reverse the trial court's order granting the State's petition for administration of psychotropic medication on the previously discussed grounds, we need not reach the issue of whether respondent's counsel was ineffective for failing to (1) move to dismiss the petition for involuntary treatment for being facially deficient and (2) object to the State's failure to introduce evidence that respondent received the written information regarding the proposed treatment.

¶ 66                                    III. CONCLUSION

¶ 67        For the reasons stated, we affirm the trial court's order granting the petition for involuntary admission but reverse the order granting the petition for administration of psychotropic medication.

¶ 68        Affirmed in part and reversed in part.

*In re Jacob P.*, 2026 IL App (4th) 251327

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Adams County, No. 25-MH-265; the Hon. John C. Wooleyhan, Judge, presiding. |
| **Attorneys for Appellant:** | Saleem Bashir Mamdani, of SBM Law Office, LLC, of Quincy, for appellant. |
| **Attorneys for Appellee:** | Todd Eyler, State's Attorney, of Quincy (Patrick Delfino, Thomas D. Arado, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for appellee. |